[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 21-14181

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ROBERT SCOTT KENNEDY,
a.k.a. Robbie Kennedy,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 1:20-cr-00020-LAG-TQL-4

————————————————

Before LAGOA, BRASHER, and ED CARNES, Circuit Judges.

CARNES, CIRCUIT JUDGE:

After a three-day jury trial, Robert Kennedy was convicted of possessing a firearm as a convicted felon, *see* 18 U.S.C. §§ 922(g)(1) and 924(a)(2); possessing heroin with the intent to distribute it, *see* 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and possessing a firearm in furtherance of a drug trafficking crime, *see* 18 U.S.C. § 924(c)(1)(A)(i). Based on his prior Georgia convictions for burglary, possession of marijuana with intent to distribute, and possession of methamphetamine with intent to distribute, Kennedy was treated as an armed career criminal and a career offender. *See generally* 18 U.S.C. § 924(e); U.S.S.G. § 4B1.1(a). Because of that his guidelines range was 420 months to life imprisonment. He received a below-guidelines sentence of 360 months.

Kennedy appeals his convictions and his sentence. On his convictions, he challenges the admission of text messages and expert testimony and asserts that the evidence was insufficient to convict him. On his sentence, he argues that he was improperly designated as an armed career criminal and a career offender, and he contends that his sentence was procedurally and substantively unreasonable. We affirm.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

### A. The Search of Kennedy's Apartment

On August 21, 2020, with a federal arrest warrant, agents from the Georgia Bureau of Investigation (GBI), FBI, and DEA

went looking for Kennedy at an apartment in Albany, Georgia that he rented with his girlfriend Ashley Galindo. When the agents knocked, Galindo opened the door, Kennedy was standing behind her. The agents asked the two of them to come outside, at which time Kennedy said, without prompting: "Everything's mine." He then told the agents he had swallowed some heroin, and several minutes later he lost consciousness and collapsed. The agents revived Kennedy using the anti-overdose drug NARCAN and called emergency medical personnel, who took him to the hospital.

While that was happening, the agents entered the apartment with Galindo. In a living room coffee table drawer, they found numerous plastic baggies and some digital scales. On the floor next to the table was a small, zipped toiletry bag. When the agents unzipped the bag, they discovered syringes and a knotted plastic baggie containing another substance they suspected was drugs. Chemical analysis later confirmed that the substances in the toiletry bag contained heroin and methamphetamine.

About a foot from the coffee table was a couch. Under the couch, the agents found a gun case containing a .40 caliber Glock 23 pistol, an extended magazine for a handgun, and two spent shell casings. The agents also found a locked safe in a hallway closet. They asked Galindo if she knew the code to open the safe, and she suggested that they try Kennedy's birthday, which she provided. That code opened the safe, and inside it the agents found another digital scale and three more firearm magazines, including one loaded with ten rounds of .40 caliber ammunition. In total, the

agents recovered five digital scales of varying sizes and four hand-gun magazines in Kennedy and Galindo's apartment as well as a handgun.

In the main bedroom, the agents found a cellphone on the nightstand beside Kennedy's side of the bed. The agents extracted the data, including text messages between Kennedy and Galindo, from that cellphone. And outside the apartment in Kennedy's truck, they found an "ammo can" containing hundreds of rounds of ammunition and a duffle bag containing a box of shotgun car-tridges.

B. The Indictment and Trial

Kennedy and six codefendants were charged with various drug and firearm-possession offenses. Kennedy was indicted for possession of a firearm by a convicted felon, *see* 18 U.S.C. §§ 922(g)(1) and 924(a)(2); possession with intent to distribute heroin, *see* 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and possession of a fire-arm in furtherance of a drug trafficking crime (the trafficking crime was the heroin offense), *see* 18 U.S.C. § 924(c)(1)(A)(i). The indict-ment charged that Kennedy's crimes occurred "on or about August 21, 2020" and that the firearm involved was a .40 caliber Glock 23 pistol.

The case went to trial. Three of the agents who had searched Kennedy's apartment testified about the investigation, as we have already described it. A DEA chemist testified that the bag-gie of substances they found in the toiletry bag near the coffee table

contained 3.63 grams of heroin and 0.265 grams of methamphetamine.

One of Kennedy's defenses at trial was that he was not responsible for the contraband found in the apartment. On that issue, the government called the owner of the apartment, who testified that she rented the property to Galindo and her "companion" Kennedy. The manager stated that she "took down" Kennedy's name as part of her lease materials, though Galindo was the only one who signed the lease. The government also called Galindo who testified that she shared the apartment with Kennedy and both of their names were on the lease. She also testified that the drugs, scales, and baggies in the apartment were Kennedy's. She added that the coffee table drawer containing scales and plastic baggies was designated as Kennedy's drawer. Galindo owned the toiletry bag discovered on the floor, but she denied that the drugs inside it were hers and testified: "If they were [mine], then I got them from [Kennedy]."

Galindo also testified that Kennedy provided her with heroin. During the three weeks they lived in the apartment together he had given her a 0.2 gram dose of heroin to shoot up "probably a hundred times." She identified the recovered cellphone as belonging to Kennedy, and she authenticated text messages between her and Kennedy that agents had extracted from that phone. In one of those text exchanges (the admissibility of which Kennedy now challenges), Galindo told Kennedy she was "sick" from heroin withdrawals but didn't "have anything." Kennedy responded that

Galindo could go into his "sa[c]k" and get "something."  Galindo testified that her text message was asking for heroin and that Kennedy's response meant that she could take some heroin from "[h]is bag of dope" to inject herself.

Kennedy objected to the admission of those text messages, arguing that they were inadmissible under Federal Rule of Evidence 404(b).[1]  The court overruled, explaining that the text messages related to the charge that Kennedy distributed heroin and were not "extrinsic evidence" subject to Rule 404.

Kennedy's codefendant Cody Harman also testified against him.  Harman testified that he had gone to Kennedy's apartment on August 9 to sell Kennedy "an 8 ball," which is an "eighth of an ounce of heroin," that Kennedy told Harman he was planning to re-sell.  According to Harman, Kennedy also said that "it was his apartment" or "their apartment" — meaning Kennedy and Galindo's — and that he had "[j]ust moved into it" and "was happy about it."  Harman added that on other occasions, he had seen Kennedy possess a "couple" or a "few" ounces of heroin, which he knew Kennedy distributed because Kennedy didn't "do heroin."

GBI agent Stripling Luke testified as an expert in the language and tools of the drug trade.  He told the jury that 3.63 grams of heroin was a "distribution quantity" and that finding certain

---

[1] Rule 404(b) prohibits the admission of "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).

items near drugs "would suggest" the drugs "were intended for distribution." After viewing pictures of Kennedy's apartment on the day of the search, Luke identified small jewelry bags (potentially used for bagging small quantities of drugs) and multiple scales of different sizes in the picture, which he believed indicated an intent to distribute. He also explained that drug traffickers have firearms "for protection" and use them "as payment" by trading them for drugs, and he noted that in Kennedy's case there were "drugs and scales . . . within a foot of the firearm."

Additional testimony tied Kennedy to the Glock and firearm-related paraphernalia. Galindo testified that she had seen Kennedy at a motel with a handgun several months before the search of the apartment. She testified that the locked safe in which the agents found three firearm magazines and ten rounds of ammunition belonged to Kennedy and that the code to open the safe was his birthday. And she testified that the truck in which the agents found the rifle and shotgun ammunition was Kennedy's.

Several of Kennedy's codefendants testified about having seen him with a firearm. Josh Walls testified that he saw Kennedy buy a black .40 caliber Glock and three magazines, including an extended magazine and a 50-round drum, in July 2020 (the month before Kennedy's arrest). Donald Hammock testified that he saw Kennedy with a "black Glock pistol," also in July 2020. And Harman testified that Kennedy had shown him a pistol when he visited Kennedy's apartment on August 9, 2020.

The jury found Kennedy guilty of all three charges.

C. Sentencing

In the presentence investigation report (PSR), Kennedy was designated both an armed career criminal under the Armed Career Criminal Act, 18 U.S.C. § 924(e) (ACCA), and a career offender under the U.S. Sentencing Guidelines, *see* U.S.S.G. § 4B1.1(a).  With the ACCA and career offender enhancements, the PSR calculated Kennedy's guidelines range for the felon in possession and heroin offenses as 360 months to life.  The conviction for possession of a firearm in furtherance of a drug trafficking crime required a consecutive mandatory minimum sentence of 60 months, so Kennedy's applicable guidelines range became 420 months to life.

The PSR based Kennedy's ACCA enhancement on four predicate Georgia convictions resulting from: a 1998 burglary of a dwelling; a 1999 burglary; a 2011 possession of methamphetamine with intent to distribute; and a 2015 possession of marijuana with intent to distribute.  It based the career offender enhancement on the convictions resulting from the 2011 and 2015 drug crimes.

Kennedy did not dispute that his 2011 methamphetamine conviction qualified as a predicate offense for both enhancements.  But he did object to the ACCA enhancement, arguing that none of the other three convictions qualified as a predicate crime for ACCA purposes.  He also objected to the career offender guidelines enhancement, arguing that the marijuana offense did not qualify as a predicate crime for it.

The district court overruled Kennedy's objections.  It did so because this circuit has "repeatedly ruled that possession with the

intent to distribute marijuana as defined in Georgia is a controlled substance offense" for ACCA purposes. The court also found that the 1998 burglary of a dwelling qualified as an ACCA predicate offense. Those two convictions added to Kennedy's 2011 methamphetamine conviction totaled three qualifying predicate crimes, which made the ACCA enhancement applicable. *See* 18 U.S.C. § 924(e)(1) (requiring three previous qualifying convictions for the ACCA enhancement to apply).

The court also found that the methamphetamine and marijuana convictions qualified as predicate offenses for purposes of the career offender guideline. *See* U.S.S.G. § 4B1.1(a) (requiring "at least two prior felony convictions of either a crime of violence or a controlled substance offense" for a defendant to be a career offender).

The ACCA and career offender enhancements together pushed the guidelines range to 420 months to life.

Before sentencing Kennedy, the court heard evidence "in aggravation." That evidence concerned threatening statements Kennedy made to and about a witness who had testified at his trial, as well as Kennedy's behavior during the trial itself. Specifically, a deputy marshal testified that as officers walked by Kennedy's holding cell just before the sentence hearing, Kennedy told them to put Josh Walls — a codefendant who had testified for the government at Kennedy's trial — in his cell. Kennedy's statement prompted marshals to re-handcuff all the inmates "for safety purposes."

Walls himself testified that "other inmates" had told him Kennedy would harm his family if he testified against Kennedy. Walls also testified that Kennedy had greeted him earlier the day of sentencing by saying, "Hey, Rat," and that he took Kennedy's request to put him in the same cell to mean Kennedy wanted to "jump on" him. The government reminded the court that Kennedy's response to the jury's verdict was "to rip his mask off, throw it on the table, and state 'Fuck,' with the jury still in the box."

The court sentenced Kennedy to 300 months on the felon in possession offense and 120 months on the heroin offense, to run concurrently. It also sentenced him to 60 months on the possession of a firearm in furtherance of a drug offense, to run consecutively, for a total sentence of 360 months. The court noted that the sentences it was imposing for the felon in possession and heroin offenses reflected "a downward variance based on the [18 U.S.C. §] 3553(a) factors." It explained that "a very substantial sentence" was warranted and referenced the "serious" nature of the drug crime and firearm possession. The court continued:

> But then when we add the behavior that has happened, that happened during the trial and after — I sat here during the trial. . . . [Y]our body language and interaction with Ms. Galindo. I saw how you acted when the verdict was rendered. I then got a great deal of information about threats that were made against potential witnesses and now this threat that was made. And it was a threat. It wasn't a joke. It wasn't playtime. But like you said, this is your life. You were not playing with anybody. It was a threat. It was here

almost again in my court. . . . [Y]ou can't compound
crime upon crime by then threatening the people
who play a part in the justice system.

Kennedy did not object to the procedural or substantive reasona-
bleness of the 360-month sentence.

## II. DISCUSSION

Kennedy raises a number of issues, which we will address in
this order: a) his challenge to two parts of the jury instructions; b)
his contention that the district court abused its discretion in admit-
ting certain text messages; c) his contention that the court abused
its discretion in admitting certain expert opinion testimony against
him; d) his argument that there was insufficient evidence to convict
him; e) his challenge to his ACCA sentence enhancement; f) his
challenge to his career offender sentence enhancement; and g) his
arguments that his sentence is procedurally and substantively un-
reasonable.

### A. The Two Challenged Parts of the Jury Instructions

Kennedy challenges two parts of the jury instructions on the
grounds that they materially varied from, or constructively
amended, the charges in the indictment.[2] But he invited any error

---

[2] Kennedy challenges Instruction No. 10, which begins: "You'll see that the
indictment charges that a crime was committed 'on or about' a certain date.
The Government doesn't have to prove that the crime occurred on an exact
date. The Government only has to prove beyond a reasonable doubt that the
crime was committed on a date reasonably close to the date alleged." Ken-
nedy contends that, because evidence at trial indicated that there were multi-
ple occasions on which Kennedy possessed drugs or firearms, "the jury could

in those two instructions by agreeing to their use at trial. The court asked Kennedy's counsel if he objected to each of the jury instructions he now challenges on appeal, and counsel responded as to each: "No objection."

As a result, the issues Kennedy raises involving those two instructions are waived. *United States v. Frank*, 599 F.3d 1221, 1240 (11th Cir. 2010) ("[W]hen a party agrees with a court's proposed instructions, the doctrine of invited error applies, meaning that review is waived even if plain error would result."); *see United States v. Clark*, 32 F.4th 1080, 1089–90 (11th Cir. 2022) (holding that this Court could not review the defendant's challenge to a jury charge "because [the defendant] invited the error below" where his counsel told the district court he "didn't have any objection" to the instructions and responded when asked if he "s[aw] any problem" with the specific instruction challenged on appeal: "I do not").

### B. The Admission of the Text Messages

Kennedy contends that the district court improperly admitted certain text messages from his cell phone, which the agents

---

have convicted Mr. Kennedy of possession of drugs or a firearm on a date far removed from that alleged in the indictment and it would have been permissible under the District Court's charge."

Kennedy also challenges Instruction No. 15, which lists the elements that must be "proved beyond a reasonable doubt" if Kennedy is to be found guilty of possessing a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c). Kennedy contends that the jury instruction "departed from the specifics of the superseding indictment" because (unlike the superseding indictment) it did not specify a date, drug crime, or firearm.

seized during their search.[3]  In Kennedy's view, Federal Rule of Evidence 404(b) prevented the admission of those text messages because he did not receive pretrial notice of the texts, and pretrial notice is required under that rule for the admission of evidence of other crimes, wrongs, or acts.  *See* Fed. R. Evid. 404(b)(2)–(3) (requiring "reasonable notice" for the admission of evidence of any other crime, wrong, or act used for a purpose other than to prove conformity with a particular character trait).  We review the district court's admission of Rule 404(b) evidence over an objection only for abuse of discretion.  *United States v. Brown*, 587 F.3d 1082, 1091 (11th Cir. 2009).[4]

The text messages are between Kennedy and his girlfriend Galindo.  They show Galindo telling Kennedy that she was at their apartment "sick" and that she did not "have anything," which Galindo testified meant she was going through heroin withdrawals.  Kennedy responded that his "sa[c]k" was "there somewhere" and asked her to "look for it," which Galindo testified meant she could have heroin from "[h]is bag of dope."

---

[3] Kennedy also seeks to challenge the admission of photographs.  But as the government correctly notes, the photographs identified by Kennedy were never admitted into evidence.  The text messages were admitted.

[4] We do not reach the government's argument that we should review the admission of the challenged text messages only for plain error, *see United States v. Harris*, 886 F.3d 1120, 1127 (11th Cir. 2018) (explaining that we review claims of evidentiary error for plain error when those claims are raised for the first time on appeal), because we conclude that Kennedy cannot prevail under the abuse of discretion standard.

There was no abuse of discretion and no violation of Rule 404(b) here because the text messages are not merely "[e]vidence of any other crime, wrong, or act" that was not charged in the indictment. *See* Fed. R. Evid. 404(b)(1). Instead, the texts are "inextricably intertwined with the evidence regarding the charged offense" because whether Kennedy provided Galindo with heroin is directly relevant to at least one of the charges against him — possession with intent to distribute heroin. *Cf. United States v. Jiminez*, 224 F.3d 1243, 1249–50 (11th Cir. 2000) (holding that evidence of marijuana possession was admissible in prosecution for distribution of methamphetamine).

The district court correctly observed that that charge was "directly related to Ms. Galindo" and that the challenged text messages supported the government's theory that Kennedy was "supplying Ms. Galindo with narcotics" (the drugs agents seized during their search). That conduct — having heroin in his possession and intending to distribute it to other people, like Galindo — is precisely the crime with which Kennedy was charged. To the extent Kennedy contends that sharing free heroin does not qualify as distributing a controlled substance under 21 U.S.C. § 841(a)(1), we reject that theory for the reasons explained below. *See infra* at Part II.D.

The text messages also reinforce Galindo's testimony that Kennedy frequently provided her with heroin out of his drug stash while they lived together at the apartment. And they reinforce co-defendant Harman's testimony that he sold heroin to Kennedy in

the apartment. So the texts "corroborate[] the government's evidence" about Kennedy possessing heroin with the intent to distribute it and "support[] the government's claim that [he] was guilty of the charged [drug] offense." *See Jiminez*, 224 F.3d at 1250. That removes them from the scope of Rule 404(b). *See id.*[5]

## C. The Admission of Agent Luke's Testimony

Kennedy contends that the district court improperly allowed GBI agent Luke, who proffered testimony as an expert witness on the language and tools of the drug trade, to testify about "ultimate issues" in the case in violation of Federal Rule of Evidence 704(b). That rule prohibits an expert witness in a criminal case from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). When a party

---

[5] The decisions cited by Kennedy to support his Rule 404(b) argument do not do so. Those decisions were about evidence of crimes unrelated to any crime charged in the indictment, while the challenged evidence in this case was direct evidence of a charged crime. *See United States v. Carrasco*, 381 F.3d 1237, 1241 (11th Cir. 2004) (concluding that evidence of activities independent of the charged drug offenses (i.e., "evidence of [other] drug dealings" and of the defendant's "alleged operation of a tire business as a front for drug operations") were admitted in error under Rule 404(b)); *United States v. Perez-Tosta*, 36 F.3d 1552, 1560 (11th Cir. 1994) (treating testimony about a defendant's "role in . . . earlier drug deals" as Rule 404(b) evidence); *United States v. Veltmann*, 6 F.3d 1483, 1498 (11th Cir. 1993) (concluding where defendants were charged with crimes relating to a specific fire set at one defendant's house, that Rule 404(b) covered statements made in response to questioning about "any previous fires on property owned by [that defendant]").

raises a claim of evidentiary error for the first time on appeal, which Kennedy concedes he is doing here, we review only for plain error. *See Harris*, 886 F.3d at 1127.

Luke testified that the type and quantity of drugs can "suggest" whether they're intended for distribution or personal use and that 3.63 grams of heroin (the amount found in Kennedy's apartment) is a "distribution quantity." He testified that people who buy heroin for personal use in Kennedy's area typically buy "two tenths of a gram" (that's one eighteenth the amount found in Kennedy's apartment). He also testified that finding certain items near drugs "would suggest" that those drugs "were intended for distribution." Those items include "a scale that's going to measure tenths of a gram," "multiple scales," and "small jewelry bag[s]." Luke identified all of those items in pictures of Kennedy's apartment. He informed the jury that he does "not come across people who have five scales in their house that are not involved in drug distribution" and that the total number of scales and their varying sizes "indicates" distribution. And he testified that drug traffickers use firearms "for protection" and "as payment," and in Kennedy's case there were "drugs and scales . . . within a foot of the firearm."

None of that testimony violates Rule 704(b). Although Rule 704(b) does not allow an expert to "expressly state a conclusion that the defendant did or did not have the requisite intent," an expert can still testify to facts that raise an "obvious inference" that an element of a charged offense was present. *United States v. Alvarez*, 837 F.2d 1024, 1031 (11th Cir. 1988). As long as "the expert [leaves]

this inference for the jury to draw," his testimony does "not violate rule 704(b)." *Id.* By testifying about what the evidence "suggest[ed]," Luke left to the jury whether to draw inferences about Kennedy being guilty of the charged crimes. There was no plain error.

### D. The Sufficiency of the Evidence

Kennedy contends that there was insufficient evidence to support his convictions. In making this argument, he contends that he was wrongly convicted based on circumstantial evidence and speculation. He also argues that there was not enough evidence to show that he was distributing drugs because the evidence did not prove he intended to sell them instead of give them away — in other words, he was something of a Johnny Appleseed in the drug world. And he argues that there's no "nexus" tying him to the drugs and gun because he didn't "possess sufficient control over the house" or the safe where those items were seized. Instead, he says, the evidence established only his "mere presence at the residence where drugs were found." All of those arguments fall woefully short.

"The sufficiency of evidence supporting a criminal conviction is a question of law, which we review *de novo.*" *United States v. Silvestri*, 409 F.3d 1311, 1327 (11th Cir. 2005). "[W]e examine the evidence in the light most favorable to the government, drawing all reasonable inferences and making all credibility choices in the government's favor," and "we will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have

found guilt beyond a reasonable doubt." *Id.* (quotation marks omitted).

As to his complaint about circumstantial evidence, "in determining the sufficiency of the prosecution's case, we make no distinction between circumstantial and direct evidence." *United States v. Tate*, 586 F.3d 936, 945 (11th Cir. 2009). Possession of a firearm "can be shown by circumstantial as well as direct evidence" and "can be either actual or constructive." *United States v. Wright*, 392 F.3d 1269, 1273 (11th Cir. 2004). Possession of drugs can also be constructive, and an intent to distribute them "can be proven circumstantially from, among other things, the quantity of [the drug] and the existence of implements such as scales commonly used in connection with the distribution of [the drug]." *United States v. Poole*, 878 F.2d 1389, 1392 (11th Cir. 1989). As to speculation, there was no need for any and no indication that any played a role in Kennedy's convictions.

As for what we are calling Kennedy's Johnny Appleseed argument, illegal drugs are not apple trees. The criminal drug possession statute he was convicted of violating makes no distinction between selling drugs and giving them away. It makes it "unlawful for any person knowingly or intentionally to . . . possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). The terms "dispense" and "distribute" are both defined to mean "deliver." *See id.* § 802(10), (11). The statute prohibits possession with intent to transfer controlled substances whether for gain or gift. In the *Catchings* case the defendant

thought the person to whom he transferred crack cocaine wanted it for his own use instead of to distribute it. *See United States v. Catchings*, 922 F.2d 777, 778–82 (11th Cir. 1991). The district court had instructed the jury that "to distribute simply means to deliver or transfer possession to another person with or without any financial interest in the transaction." *Id.* at 779. We affirmed.

Other circuits agree that there is no Johnny Appleseed exception to statutes prohibiting the distribution of controlled substances. *See United States v. Cortes-Caban*, 691 F.3d 1, 19 (1st Cir. 2012) (affirming a § 841(a)(1) conviction and stating: "[I]t is well accepted that drugs may be distributed by giving them away for free; 21 U.S.C. § 841(a)(1) imposes no requirement that a sale take place.") (quotation marks omitted); *United States v. Fregoso*, 60 F.3d 1314, 1325 (8th Cir. 1995) (rejecting defendant's argument that his § 841(a)(1) "conviction cannot stand because there was no evidence that he bought cocaine for 'resale,'" explaining that: "No 'sale' is required to violate the statute. [The defendant] 'distributed' cocaine within the meaning of the statute when he freely gave cocaine to [other people]."); *United States v. Washington*, 41 F.3d 917, 919 (4th Cir. 1994) (affirming a § 841(a)(1) conviction where the defendant "did not sell drugs" and instead planned to "share [them] with his friends," explaining that his "intent to share the cocaine with others is sufficient for a court to find that he possessed drugs with intent to distribute"); *United States v. Vincent*, 20 F.3d 229, 232–33 (6th Cir. 1994) (affirming a § 841(a)(1) conviction and explaining: "[T]he government needed only to show that defendant knowingly or intentionally delivered a controlled substance. It was irrelevant

for the government to also show that defendant was paid for the delivery.") (citation omitted); *United States v. Ramirez*, 608 F.2d 1261, 1264 (9th Cir. 1979) (affirming a conviction under § 841(a)(1), stating: "[A]lthough apparently no commercial scheme is involved, [the defendant's] sharing the cocaine with [his friends] constitutes 'distribution' for purposes of 21 U.S.C. s 841(a)(1).").[6]

  The totality of evidence strongly supported Kennedy's convictions. Testimony from multiple sources proved that it was his drugs and related contraband found in the apartment on August 21, 2020. That is the date "on or about" which Kennedy was charged with committing the crimes. GBI agent Shannon McCook testified that when Galindo opened the door to the investigators,

---

[6] This Court and the Supreme Court have also used the term "distribute" to include free transfer or free delivery in other contexts. *See, e.g.*, *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 4 (2019) (describing how the petitioner "distributes [a publication] to health care providers for free"); *United States v. Williams*, 553 U.S. 285, 295 (2008) ("One could certainly 'distribute' child pornography without expecting payment in return."); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919 (2005) (noting that the defendants "distribute free software products"); *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1238 (11th Cir. 2018) (recounting that a party "distributes vegetarian or vegan food, free of charge"); *Norwood v. Harrison*, 413 U.S. 455, 458 (1973) (explaining that a state board "distribute[d] free textbooks"); *ISKCON Miami, Inc. v. Metropolitan Dade County*, 147 F.3d 1282, 1284 (11th Cir. 1998) (describing a claim challenging the restriction of "areas where people may distribute free literature"); *Tiftarea Shopper, Inc. v. Georgia Shopper, Inc.*, 786 F.2d 1115, 1117 (11th Cir. 1986) (stating that the defendant "began to distribute a competing free advertisement newspaper").

Kennedy immediately said without prompting: "Everything's mine." The apartment's owner testified that she rented the property to Galindo and Kennedy and that she included Kennedy's name in the "lease materials," even though he wasn't officially on the lease. Galindo likewise testified that the apartment was both hers and Kennedy's. And Harman, one of Kennedy's codefendants, testified that Kennedy had said "it was his apartment" or "their apartment" (meaning Kennedy's and Galindo's), and he had moved into it. That is enough evidence to support a finding that Kennedy had "ownership, dominion, or control" over the premises where the heroin and gun were found and therefore had at least constructive possession of them. *See Poole*, 878 F.2d at 1392 (drugs); *Wright*, 392 F.3d at 1273 (firearm).

Testimony also supported a finding that the drugs and distribution paraphernalia inside the apartment were Kennedy's, not Galindo's. Galindo testified that the heroin, scales, and baggies were Kennedy's. She told the jury that Kennedy gave her heroin to shoot up "probably a hundred times" during the three weeks they lived there together. She authenticated texts with Kennedy in which he said she could go into his "sa[c]k"—which she testified meant "[h]is bag of dope"— and get "something." And Harman testified that he had seen Kennedy possess a "couple" or a "few" ounces of heroin and that he had personally sold Kennedy an eighth of an ounce of heroin, which Kennedy told Harman that he was planning to re-sell.

The items found alongside the drugs, which we have already recounted, also support the jury's finding that Kennedy intended to distribute the drugs. Agent McCook testified that he found in Kennedy's apartment five digital scales of varying sizes, numerous plastic baggies, and a substance he submitted to the DEA for testing. A DEA chemist testified that substance contained 3.63 grams of heroin. Agent Luke was of the opinion that amount of heroin was a "distribution quantity" and that the surrounding paraphernalia "would suggest" that the drugs "were intended for distribution." If the jury credited the testimony of those individuals, which it had every reason to do, it could reasonably find, as it did, that Kennedy possessed the heroin and drug paraphernalia with the intent to distribute. *See Poole*, 878 F.2d at 1392 (concluding that there was sufficient evidence for conviction on a possession-with-intent-to-distribute charge based on factors including the "quantity" of the substance and the "sophisticated" nature of the "scale" possessed by the defendant).

And finally, abundant evidence supported the jury finding that Kennedy possessed a firearm and used it in furtherance of his drug offense. Three GBI agents testified to finding the Glock and ammunition in the gun case, the safe, and the truck that Galindo testified belonged to Kennedy. Galindo testified that she had seen Kennedy at a motel with a handgun a few months before the search of the apartment. Kennedy's codefendant Walls told the jury that he saw Kennedy buy a black .40 caliber Glock and three magazines in July 2020. Kennedy's codefendant Hammock testified that he saw Kennedy with a "black Glock pistol" that same month. And

Kennedy's codefendant Harman testified that Kennedy showed him a pistol when he brought heroin to Kennedy's apartment less than two weeks before the agents seized the firearm.

GBI agent Luke's expert testimony linked the firearm to the drug crime. The jury heard from Luke that drug traffickers have guns "for protection" and also use them "as payment" by trading them for drugs, and that in Kennedy's case there were "drugs and scales . . . within a foot of the firearm." The testimony of Galindo, and of Kennedy's codefendants, and of the GBI agents was more than enough to support a finding that he possessed the Glock and did so in furtherance of a drug trafficking crime. *See Wright*, 392 F.3d at 1273; *Poole*, 878 F.2d at 1392; *Silvestri*, 409 F.3d at 1327. If more were needed — which it isn't — "this Court has long recognized that, as Forrest Gump might say, drugs and guns go together like peas and carrots." *United States v. Lopez*, 649 F.3d 1222, 1242 (11th Cir. 2011).

### E. The Challenge to ACCA Sentence Enhancement

For purposes of calculating Kennedy's sentence, the district court determined that he was an armed career criminal under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). Under the ACCA, a defendant's minimum sentence for a conviction for unlawfully possessing a firearm is 15 years imprisonment if the defendant has "three previous convictions . . . for a violent felony or a serious drug offense" committed on separate occasions. 18 U.S.C. § 924(e)(1).

The PSR identified four Georgia convictions that potentially qualify as predicate offenses supporting an ACCA enhancement: (1) a 1998 conviction for burglary of a dwelling, (2) a 1999 conviction for burglary of a building, (3) a 2011 conviction for possession of methamphetamine with intent to distribute, and (4) a 2015 conviction for possession of marijuana with intent to distribute. Given those convictions, the district court determined that there were "certainly three predicate offenses" and "possibly a fourth." It decided that the 1998 burglary conviction, the methamphetamine possession conviction, and the marijuana possession with intent to distribute conviction all qualified as predicate offenses, so it applied the ACCA enhancement without considering the 1999 burglary conviction.

Kennedy does not challenge the use of the methamphetamine possession with intent to distribute conviction, so if any two of his other three convictions qualify, the ACCA sentence enhancement was proper. Kennedy does challenge the court's decision that the 1998 burglary conviction and the marijuana possession conviction are predicate offenses under the ACCA. We don't have to decide if he is right about the marijuana conviction, because we are convinced that both burglary convictions count and when added to the unchallenged methamphetamine conviction make a total of three qualifying prior convictions, which is enough to ring the ACCA bell.[7]

_____

[7] We can decide whether the 1999 burglary conviction qualifies as an ACCA predicate offense even though the district court did not reach that question.

The ACCA lists "burglary" as one of the enumerated "violent felon[ies]" that (if punishable by a term of imprisonment exceeding one year) qualifies as predicate offense for a sentence enhancement. 18 U.S.C. § 924(e)(2)(B)(ii); *United States v. Gundy*, 842 F.3d 1156, 1160–61 (11th Cir. 2016). The crime of "burglary" listed in the ACCA refers to the "generic" version of burglary, which consists of three elements: "(1) an unlawful or unprivileged entry into, or remaining in, (2) a building or other structure, (3) with intent to commit a crime therein." *Gundy*, 842 F.3d at 1161, 1164.

If the elements of burglary under a state statute "match" those three elements of a generic burglary, then a conviction for burglary under that state statute qualifies as an ACCA predicate offense. *See id.* at 1161–62 (quotation marks omitted). As we explained in *Gundy*, the Georgia burglary statute in effect when

---

*See United States v. Gandy*, 710 F.3d 1234, 1238–39 (11th Cir. 2013) (affirming the application of an ACCA sentencing enhancement based on a predicate offense not relied on by the district court), *overruled in part on other grounds by Johnson v. United States*, 576 U.S. 591 (2015); *United States v. Hall*, 714 F.3d 1270, 1271 (11th Cir. 2013) ("[W]e may affirm for any reason supported by the record, even if not relied upon by the district court.").

Kennedy contends that the government waived its present position that the 1999 burglary conviction counts as an ACCA predicate offense. He relies on the statement made by the government's counsel at his sentencing hearing that, of the four prior convictions, it was "least clear" the 1999 burglary convictions qualified under the ACCA, so the ACCA sentencing enhancement "should be based" on the other three convictions. That statement does not constitute a waiver. *See Tribue v. United States*, 929 F.3d 1326, 1332–34 (11th Cir. 2019) (concluding that the government had not waived its reliance on a conviction not asserted as an ACCA predicate offense at sentencing).

Kennedy was convicted of burglary in 1998 and again in 1999 — Ga. Code Ann. § 16-7-1 (2011) — is divisible.  *See id.* at 1167–68.[8] The statute covered multiple distinct crimes depending on the location of the unlawful act.  *See id.*  Section 16-7-1 criminalized burglaries of "dwelling houses or buildings housing a business, which are generic burglaries" that support an ACCA enhancement.  *Id.* at 1169.  It also criminalized burglaries of "vehicles, railroad cars, watercrafts, or aircrafts, which are not generic burglaries" and do not support an ACCA enhancement.  *Id.*

Because the statute of conviction is divisible, we use the modified categorial approach to determine whether Kennedy's burglary convictions qualify as ACCA predicate offenses.  *See id.* at 1162, 1168.  Under that approach, we assess "which of the alternative elements in Georgia's burglary statute formed the basis of

---

[8] In 2012 Georgia amended its burglary statute, Ga. Code Ann. § 16-7-1, for the first time since 1980.  *See* 2012 Ga. Laws 899; 1980 Ga. Laws 770.  The pre-2012 version of Ga. Code Ann. § 16-7-1 was the version of the statute under which Kennedy was previously convicted.  That version of the statute states:

> A person commits the offense of burglary when, without authority and with the intent to commit a felony or theft therein, he enters or remains within the dwelling house of another or any building, vehicle, railroad car, watercraft, or other such structure designed for use as the dwelling of another or enters or remains within any other building, railroad car, aircraft, or any room or any part thereof.

Ga. Code Ann. § 16-7-1(a) (2011).  The crime is "punished by imprisonment for not less than one nor more than 20 years."  *Id.*

[Kennedy's] prior burglary convictions and whether those elements match the generic definition of burglary." *Id.* at 1168.

According to the undisputed facts in the PSR, Kennedy's 1998 burglary was for unlawfully entering a "dwelling." His 1999 burglary was for unlawfully entering a "building" belonging to an individual.[9] Both of those burglaries fit into the category of "either dwelling houses or buildings housing a business," not into the category of "vehicles, railroad cars, watercrafts, or aircrafts." *See id.* at 1169. So both crimes fit the generic definition of burglary, and both convictions can serve as predicate offenses for an ACCA enhancement. *Id.*

Kennedy's arguments to the contrary lack merit. He contends that the Georgia burglary statute is indivisible and creates a single crime that is overbroad compared to the generic definition of burglary. But as Kennedy acknowledges, that position is in conflict with *Gundy*, which held that the Georgia burglary statute was

---

[9] Kennedy did not dispute those facts and has not contested them in this Court. We may rely on those undisputed facts when we decide whether Kennedy's prior convictions qualify as ACCA predicate offenses. *See United States v. Rosales-Bruno*, 676 F.3d 1017, 1020 (11th Cir. 2012) (holding that when we determine whether prior convictions qualify as "crime[s] of violence" under the ACCA, we may "rely on facts contained in a presentence investigation report (PSR), so long as those facts are undisputed"); *see also In re Welch*, 884 F.3d 1319, 1325 (11th Cir. 2018) (concluding that the defendant had three qualifying ACCA convictions and explaining: "Because we apply the modified categorical approach . . . , we can look at . . . the PSR's undisputed factfindings to determine which statutory subsection he was convicted under.").

divisible. *See* 842 F.3d at 1167–69. He asks us to overturn *Gundy*, suggesting without elaboration that it "should be reconsidered in light of" *Borden v. United States*, 593 U.S. 420 (2021). But *Borden* addressed whether a crime requiring a mental state of recklessness can constitute *a violent felony* under the ACCA. *See id.* at 424–25. It had no impact on *Gundy*'s holding that Georgia's *burglary* statute is divisible, which remains binding on us. *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) ("[A] prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*."). That is why we have continued to treat Georgia's burglary statute as divisible even after the issuance of *Borden*. *See United States v. Roosevelt Coats*, 8 F.4th 1228, 1242 (11th Cir. 2021) (noting that the Georgia burglary statute is divisible and concluding that the defendant's "Georgia burglary conviction qualifies as an ACCA enumerated crime under the *Gundy* standard"). Our *Roosevelt Coats* decision was published on August 12, 2021, which is two months after the Supreme Court's *Borden* decision was published.

Kennedy also cites *Borden* for his argument that the Georgia burglary statute is overbroad because a Georgia burglary (unlike a generic ACCA burglary) can be committed with a *mens rea* of recklessness. *See Somers v. United States*, 66 F.4th 890, 895 (11th Cir. 2023) (explaining that "in *Borden* a divided Supreme Court held that the ACCA's elements clause does not include offenses that criminalize reckless conduct; it covers only offenses that require a *mens rea* of knowledge or intent") (quotation marks omitted).

Kennedy's reasoning is this. At the times of his burglary convictions, the Georgia burglary statute required an "intent to commit a felony or theft" following unlawful entry. Ga. Code Ann. § 16-7-1(a) (2011). Examples of felonies that can support a Georgia burglary conviction if there is intent to commit them after entry include aggravated assault and making terroristic threats. *See Hewatt v. State*, 455 S.E.2d 104, 105–106 (Ga. Ct. App. 1995). The crimes of aggravated assault and making terroristic threats (separate and apart from any burglary) require a *mens rea* of only recklessness. *See Patterson v. State*, 770 S.E.2d 62, 67–68 (Ga. Ct. App. 2015) (aggravated assault); *Major v. State*, 800 S.E.2d 348, 352 (Ga. 2017) (terroristic threats). Therefore, says Kennedy, in Georgia burglary is a recklessness crime that cannot support an ACCA sentencing enhancement. But that confuses the *mens rea* (intent) for the entering or remaining inside a building with the least culpable *mens rea* (recklessness) of the crime the burglar commits inside.

Look at it this way, Georgia law is what the Georgia Supreme Court says it is. *See Johnson v. United States*, 559 U.S. 133, 138 (2010) ("We are, however, bound by the [State] Supreme Court's interpretation of state law, including its determination of the elements of [a state statute]."); *Riley v. Kennedy*, 553 U.S. 406, 425 (2008) ("A State's highest court is unquestionably the ultimate expositor of state law.") (cleaned up); *Wisconsin v. Mitchell*, 508 U.S. 476, 483 (1993) ("There is no doubt that we are bound by a state court's construction of a state statute."); *Johnson v. 3M Co.*, 55 F.4th 1304, 1312 (11th Cir. 2022) ("The Georgia Supreme Court's latest word in [a decision about Georgia law] controls us when it comes to Georgia

law."); *In re Cassell*, 688 F.3d 1291, 1292 (11th Cir. 2012) (referring to "the Georgia Supreme Court, which is the one true and final arbiter of Georgia law").

And that Court has decided that the specific intent to commit a crime once unlawfully inside a building is essential to burglary under Georgia law. *Daniel v. State*, 804 S.E.2d 61, 66 (Ga. 2017) ("[B]urglary is a specific intent crime."); *see also Dillard v. State*, 753 S.E.2d 772, 774 (Ga. Ct. App. 2013) ("Burglary is a specific intent crime — the State must prove that the defendant intended to commit a felony after making an unauthorized entry."); *Gundy*, 842 F.3d at 1164 (explaining that the Georgia burglary statute requires the intruder to have the "intent to commit a felony or theft" while unlawfully inside the burglary location) (quoting Ga. Code Ann. § 16-7-1(a) (2011)). And the Supreme Court of the United States has decided that generic burglary requires that the unlawfully entering or remaining in a building "with intent to commit a crime" is what is required. *Taylor v. United States*, 495 U.S. 575, 599 (1990); *see Mathis v. United States*, 579 U.S. 500, 504 (2016); *Gundy*, 842 F.3d at 1164; *United States v. Howard*, 742 F.3d 1334, 1342 (11th Cir. 2014). The two requirements match.

Unlawfully entering or remaining in a building or structure with the intent to commit a crime inside is all generic burglary requires that a burglar have specifically intended to do. There is no requirement that the crime actually committed inside be a specific intent crime, or even that any crime actually have been committed

inside.  After all, the best laid plans of mice and burglars often go astray.[10]  Intent can be frustrated, minds can change.

Kennedy also contends that the Georgia burglary statute is overbroad under *Descamps v. United States*, 570 U.S. 254 (2013).  But it isn't.  *Descamps* held that a conviction under a burglary statute that also criminalized "simple shoplifting" did not qualify as a generic burglary under the ACCA because the statute did not "require[] an unlawful entry along the lines of breaking and entering" for a conviction.  *See id*. at 264–65.  But the Georgia statute which Kennedy was convicted of violating does require "an unlawful entry," and we have held that the same statute "substantially conform[s] to the generic definition of burglary."  *Gundy*, 842 F.3d at 1169.

Kennedy's final argument against the ACCA enhancement is that his 1999 conviction for burglary of a "building" cannot be a predicate offense, because the term "building" is broader under Georgia law than that same term used in the generic definition of burglary.  He points out that the version of the Georgia burglary statute in effect at the times of his convictions covered the unlawful entries of, for example, a "storage shelter" that was "attached to" and "contiguous to the main building" of a business, *Garrett v. State*, 578 S.E.2d 460, 462–63 (Ga. Ct. App. 2002), and a "roofed and walled" "layaway trailer" that "functioned as a storehouse" for a

---

[10] *Cf.* Robert Burns, *To a Mouse*, *in* THE POEMS AND SONGS OF ROBERT BURNS 72, 72 (E.P. Dutton & Co. eds., 3d ed. 1909).

business, *Franks v. State*, 524 S.E.2d 545, 547 (Ga. Ct. App. 1999). Given that caselaw, Kennedy says, the record cannot "satisfy *Taylor* [*v. United States*, 495 U.S. 575 (1990)]'s demand for certainty when determining whether a defendant was convicted of a generic offense." *Mathis*, 579 U.S. at 519 (quotation marks omitted).

We disagree and see no conflict between Georgia law and the generic definition of burglary. Under the modified approach, the fact that Kennedy burglarized a building "satisf[ies] *Taylor's* demand for certainty that [Kennedy's] convictions were for burglary of a *building or other structure*." *Gundy*, 842 F.3d at 1170 (emphasis added). That's a "generic burglary," and it's a predicate offense under the ACCA. *Id.*

Kennedy's two burglary convictions plus the methamphetamine possession with intent to distribute conviction, which he does not challenge, make three ACCA-qualifying priors. Three is enough, the enhancement was properly applied regardless of whether Kennedy's conviction for possession of marijuana could also be counted.

### F. Challenge to Career Offender Sentence Enhancement

Kennedy asserts that the district court incorrectly classified him as a "career offender" under U.S.S.G. § 4B1.1(a) using his prior Georgia conviction for possession of marijuana with intent to distribute. That classification applies if (among other things) the defendant has "at least two prior felony convictions of either a crime of violence or a controlled substance offense." *Id.* Kennedy does not contest that his conviction for possession of methamphetamine

with intent to distribute qualifies as a controlled substance offense. That's one qualifying conviction. What he does contest is whether his Georgia marijuana conviction is a "controlled substance offense" as defined under § 4B1.2(b) of the guidelines. We review *de novo* whether that conviction qualifies. *See United States v. Frazier*, 89 F.3d 1501, 1505 (11th Cir. 1996).

It does. Even if Kennedy were right that there's a meaningful mismatch between Georgia's definition of marijuana and the CSA's definition of marijuana, any inconsistency does not matter for purposes of applying the career offender sentencing enhancement. "A drug regulated by state law is a 'controlled substance' for state predicate offenses [under the sentencing guidelines], even if federal law does not regulate that drug," because *"state law* defines which drugs qualify as a 'controlled substance' if the prior conviction was under state law." *United States v. Dubois*, 94 F.4th 1284, 1296 (11th Cir. 2024), *cert. granted, judgment vacated sub nom. Dubois v. United States.*, 145 S. Ct. 1041 (2025), and *reinstated by* 139 F.4th 887 (11th Cir. 2025).

Kennedy's marijuana conviction was a controlled substance offense under state law at the time of his state conviction, so it is a career offender predicate offense under the sentencing guidelines. *See id.* at 1300 (affirming a career offender sentence enhancement based on a Georgia conviction for possession with intent to distribute marijuana). The district court was correct to treat Kennedy as a career offender under the sentencing guidelines.

G. Procedural and Substantive Reasonableness of Sentence

The district court varied downward from a recommended sentence range of 420 months to life imprisonment and sentenced Kennedy to 360 months, which is 60 months below the bottom of his guidelines range.  He contends his below-guidelines sentence is procedurally and substantively unreasonable.  We review the reasonableness of a sentence only for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007).

On procedural reasonableness, Kennedy challenges the judge's consideration of what he describes as "hearsay evidence" about Kennedy "making threats to those who testified against him," and consideration of what the judge described as "Kennedy's body language and reactions at trial."  He also says the court should not have considered against him his conduct (actually misconduct) during the trial.

To the extent the district court considered hearsay testimony, "reliable hearsay is admissible" during a sentencing procedure, and the sentencing judge does not need to "make explicit findings about the reliability" of that testimony.  *United States v. Docampo*, 573 F.3d 1091, 1098–99 (11th Cir. 2009).

The evidence about Kennedy's threats included his codefendant Walls' testimony that other inmates had informed him that Kennedy would hurt Walls' family in retaliation for his testimony.  Walls himself testified that Kennedy had called him a "Rat."  And a deputy testified that just before the sentencing hearing, Kennedy told him and other officers who were walking by the holding cell to put Walls in his cell.  That comment concerned the officers

enough that they re-handcuffed all of the inmates "for safety purposes."  The government also reminded the court during the sentencing hearing that Kennedy's response to the jury's verdict was "to rip his mask off, throw it on the table, and state 'Fuck,' with the jury still in the box."

There is no reason a sentencing court should not take into account a defendant's threats to harm witnesses against him and his public expressions of disrespect for the court, the jury, and the judicial proceedings as a whole.  And there are a number of good reasons a court should consider those types of misconduct when setting a sentence.  *See generally, e.g.*, 18 U.S.C. § 3553 (a)(1), (a)(2)(A) (requiring a sentencing court to consider the "characteristics of the defendant" and the need for the sentence "to promote respect of the law"); *United States v. McLellan*, 958 F.3d 1110, 1116–17 (11th Cir. 2020) (affirming sentence where factors that the district court weighed against the defendant included his "strong disrespect for the law"); *United States v. Osorio-Moreno*, 814 F.3d 1282, 1286 (11th Cir. 2016) (affirming sentence where the district court's § 3553(a) analysis took into account, among other factors, the defendant's "disrespect for law enforcement"); *see also United States v. Gonzalez*, 71 F.4th 881, 883 (11th Cir. 2023) (affirming denial of a motion for termination of a term of supervised release under a § 3553(a) analysis, based in part on "a continued disrespect for authority").

As for the substantive reasonableness of the sentence, the 360-month sentence actually fell *below* the guidelines range and the

statutory maximum, both of which pointed to life imprisonment. Given that, and all of the other facts and circumstances in this case, Kennedy's sentence is not substantively unreasonable.  *See, e.g., United States v. Boone*, 97 F.4th 1331, 1342 (11th Cir. 2024) ("Although we do not automatically presume a sentence within the guidelines range is reasonable, we ordinarily expect such a sentence to be reasonable.") (alterations adopted) (quotation marks omitted); *United States v. Coglianese*, 34 F.4th 1002, 1009 (11th Cir. 2022) (same); *United States v. Perkins*, 787 F.3d 1329, 1342 (11th Cir. 2015) (same); *United States v. Muho*, 978 F.3d 1212, 1227 (11th Cir. 2020) ("Sentences that fall within the Guidelines range or that are below the statutory maximum are generally reasonable."); *see also United States v. White*, 663 F.3d 1207, 1217 (11th Cir. 2011) (rejecting substantive reasonableness challenge to sentence that was "below the applicable guidelines range" and explaining: "We will vacate a sentence for substantive unreasonableness if, but only if, we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors . . . .") (quotation marks omitted).

Like the convictions, the sentence is due to be affirmed.

**AFFIRMED.**